**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO. 06-61239-CIV-ALTONAGA/Turnoff**

**ORION COLEY**,

Plaintiff,

vs.

**WEXFORD HEALTH SOURCES, INC.**;
and **AL LAMBERTI**, in his official capacity
as **SHERIFF OF BROWARD COUNTY**,

Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** came before the Court upon Defendant, Al Lamberti, in his official capacity

as Sheriff of Broward County's ("the BSO['s]")[1] Motion for Summary Judgment [D.E. 46], and

Defendant, Wexford Health Sources, Inc.'s ("Wexford['s]") Motion for Summary Judgment [D.E.

47], both of which were filed on September 17, 2007.  The Court has carefully considered the parties'

written submissions, the record, and applicable law.

## I.  BACKGROUND

Plaintiff, Orion Coley's ("Coley['s]") claims arise from allegedly deficient medical care he

received between January 8, 2004 and March 19, 2004, while incarcerated at the Broward County

Main Jail, the Broward County Stockade, and the North Broward Detention Center (the "Broward

Detention Facilities"), each of which is operated by the Sheriff of Broward County.  (*See Complaint*

*(Compl.)* [D.E. 1] at ¶¶ 11, 16-37).  Defendant, Wexford, is a private entity that contracted with the

---

[1] In an Order dated November 13, 2007 [D.E. 61], the undersigned granted the BSO's Motion to substitute
Al Lamberti as Sheriff of Broward County in place of former Sheriff Kenneth Jenne.

BSO to provide medical care to inmates housed in the Broward Detention Facilities.  (*See id.* at ¶ 12).

In his four-count Complaint, Coley asserts claims against each of the Defendants for violations of his

constitutional rights under 42 U.S.C. § 1983 and for common law negligence.  The undisputed facts

giving rise to Coley's Complaint are as follows.

In late December 2003, Coley was treated at the Seventh Avenue Family Health Center and

the Broward General Medical Center for problems with his right eye.  (*See Coley 2003 Medical*

*Records ("2003 Med. Rec. - Wex.")* [D.E. 47-15 & 47-16]).  On December 26, 2003, Coley was

diagnosed with "acute vision loss" and his right eye vision was measured as 20/200.  (*See id.* at

MR00102).  On December 29, 2003, he complained of decreased vision in his right eye.  (*See id.* at

MR00081).  He was given a follow-up appointment with a Dr. Lim on January 7, 2003, at 8 a.m..

(*See Coley Medical Records ("Coley Med. Rec.")* [D.E. 53-4] at 4[2]).  Coley did not attend that

appointment.[3]  (*See Compl.* at ¶ 15).

On January 8, 2004, Coley was arrested and incarcerated at the Broward County Jail.  (*See*

*id.* at ¶ 16).  During his intake processing on January 9, 2004, Broward County Jail officials noted

that Coley had an "unknown eye infection[,]" but they did not provide him with any medications.

(*Wexford Medical Records ("Wex. Med. Rec.")* [D.E. 47-5 through 47-12] at WEX 0005).  They

also noted in his Health Maintenance Record on January 9, 2004, "Hx Glaucoma."  (*Id.* at WEX

0003).  According to his medical records, Coley informed Jail staff upon processing, "I went to the

hospital yesterday because there's something wrong with my right eye.  The medication the [sic] give

---

[2] Page references to Coley's copies of his medical records utilize the CM/ECF page numbering.

[3] The parties dispute Coley's reasons for failing to attend the appointment, but the reasons are not relevant
to the disposition of the present motions.

[sic] me to use is in my property." (*Id.* at WEX 0091).

On January 10, 2004,[4] Coley initiated an Inmate Health Service Request, stating, "I have a very serious problem with my right eye. I am losing my vision." (*Id.* at WEX 0018). The Inmate Health Service Request forms provided by Wexford include a blank bottom half for notations by health care personnel. (*See id.*). On the bottom of the form, a note indicates, "seen 1/12/04." (*Id.*).

On January 11, 2004, Coley initiated an Inmate Health Service Request, stating, "I need emergency eye care. I have two (2) different kind [sic] of eye drops in my property . . . as well as a [sic] outside doctor report of my problem. I was scheduele [sic] to see an ophthomologist [sic] for an emergency visit. I am now losing sight in my right eye." (*Id.* at WEX 0017) (ellipsis in original). On the bottom of the form, a Francesca Hulse, LPN, noted, "Seen in clinic 1/12/04. New orders written." (*Id.*). On that same date, a Jenell Davis, LPN, filled out a Wexford Internal Clinic Referral Form for Coley, on which she indicated, "c/o severe eye pain. eyes red tearing. . . . ." (*Id.* at WEX 0073).

On January 12, 2004, Coley was seen by a Wexford physician's assistant ("PA"), "Abraham, P.A.C." (*See id.* at WEX 0071). The PA filled out a Wexford Referral Request form that stated "ophthalmology" and indicated on the form that Coley had no vision in his right eye and the iris was opaque. (*Id.*). The form indicates it was faxed on January 12, 2004 and on January 14, 2004. (*See id.* at WEX 0071-0072).

---

[4] Coley dated the form December 10, 2004, but the bottom of the form (filled out by Wexford healthcare personnel) indicates a date of January 10, 2004. (*See Wex. Med. Rec.* at WEX 0018). Given the timeline of the case, Coley apparently intended to indicate January 10.

Case No. 06-61239-CIV-ALTONAGA/Turnoff

On January 15, 2004, Coley received an order from a Broward County Judge[5] to be seen by a physician. (*See Coley Med. Rec.* at 24). On that date, he was seen by an ophthalmologist at Visual Health. (*See Wex. Med. Rec.* at WEX 0068-0069). He was diagnosed with inflammatory glaucoma and prescribed a number of eye drops. (*See id.* at WEX 0066, WEX 0068, WEX 0075-0077).

On January 21, 2004, Coley initiated an Inmate Health Service Request, stating, "I was supposed to a [sic] had an appointment with the opthomologist [sic]. I am in serious pain with my right eye. I can't even sleep." (*Coley Med. Rec.* at 35). On either January 21 or January 24, 2004,[6] Wexford staff indicated at the bottom of the form, "You were seen by a specialist on 1-15-04. All eye [illegible] ordered." (*Id.*).

On January 22, 2004, Coley initiated an Inmate Health Service Request, stating, "I had a judge's order to an emergency visist [sic] to an outside opthomologist [sic]. I made that first visist [sic] and since then nothing else has been [illegible]. I have lost sight in my right eye. . . . I was given by the opthomologist [sic] sample eye drop's [sic]. The count was supposed to orde [sic] the other (2) eye drops and never did. I am in a lot of pain, I [illegible]." (*Id.* at 36). The bottom of the form is not filled out. (*See id.*).

On January 24, 2004, Coley initiated an Inmate Health Service Request, stating, "I have an emergency. Need to see an ophthomologist [sic] again. The problem with my right eye has not resolved. I am in so much pain at times unbearable [sic]." (*Wex. Med. Rec.* at WEX 0016). The bottom of the form indicates that Coley was seen by a Linda Jackson, LPN, on January 29, 2004.

---

[5] The Order was dated December 15, 2004 by the judge, but stamped January 15, 2004. Given the timeline of the case, the judge's date appears to be in error.

[6] Both dates appear on the form.

4

Case No. 06-61239-CIV-ALTONAGA/Turnoff

(*See id.*).  Ms. Jackson noted on the form, "Rt. eye noted very reddened. . . . Refer to urgent care." (*Id.*).

On January 27, 2004, Coley initiated an Inmate Health Service Request, inquiring, "(1) Can I be seen by a doctor?  Yes or no circle one."  (*Coley Med. Rec.* at 38).  The bottom of the form is not filled out.  (*See id.*).

On January 28, 2004, Coley initiated an Inmate Health Service Request, stating, "I need to see a doctor as soon as possible.  I am only being ignored."  (*Id.* at 39).  The bottom of the form is not filled out.  (*See id.*).  Coley initiated a second Inmate Health Service Request on January 28, 2004, stating, "Since I've been in the BCJ my eye problem has only gotten worsen [sic].  It's like cruel and unusual punishment.  I never get any response back from my request slips.  I need emergency help for my eye."  (*Id.* at 40).  The bottom of the form is not filled out.  (*See id.*).

On January 29, 2004, Coley filed an Inmate Grievance Form with the BSO, stating, "I have a very serious right eye problem in [illegible] I was diagnosed with before my arresst [sic].  Since my [illegible] I have pleaded by case over and over to anyone who [illegible] listen.  On Jan. 15, 04 a public defender had to get a Judge's order for me to see an outside opthomologist [sic]. [illegible] I now have no vision in my right eye. . . . I have been in to [sic] much pain for to [sic] long.  I need to see a doctor now."  (*Id.* at 41).[7]

In the record, there is a fax cover sheet dated February 2, 2004, from a Paula Sircus RN to Visual Health that states, "Re: Orion Coley."  (*Wex. Med. Rec.* at WEX 0058).  The cover sheet

---

[7] It is unclear why Coley's requests from January 27 through January 29 were not included in Wexford's copy of Coley's medical records.

indicates that it was faxed on February 2, 2004 and February 10, 2004 and bears the notation "2nd Request - Very Important!" (*Id.*).

On February 3, 2004, Coley initiated an Inmate Health Service Request, stating, "I have been told that I have glacoma [sic] in my right eye.  I would like to educate myself on the problem with some kind of literature or through a conversation with you." (*Coley Medical Records Part Two ("Coley Med. Rec. 2")* [D.E. 53-5] at 1).  The bottom of the form is not filled out. (*See id.*).

On February 8, 2004, Coley initiated an Inmate Health Service Request, stating, "These drops for my eye is [sic] not solving the problem.  I am not being given my drops properly.  Since I have been taking my drops never have I taken them properly.  I need to see an optomologist [sic]." (*Wex. Med. Rec.* at WEX 0015).  The bottom of the form indicates, "Referral was placed 2/11/04." (*Id.*).

On February 10, 2004, a second Broward County judge entered an order requiring that Coley be seen by "a licensed medical doctor specializing in treatment of eye [sic]." (*Coley Med. Rec. 2* at 4).  On February 11, 2004, it appears that a Mirna Waldele, PA-C, completed an ophthalmology referral request to a Dr. Kornhaber. (*See Wex. Med. Rec.* at WEX 0053).  The request indicated, among other things, "Hx Glaucoma," "blindness," and "As per Court Order." (*Id.*).

On February 12, 2004, Coley initiated an Inmate Health Service Request, stating, "I am now out of most of my eye drops.  Without these drops the pressure in my eye intensifies.  I am [illegible] pain and no one seems to care." (*Wex. Med. Rec.* at WEX 0014).  The bottom of the form indicates "Seen [illegible] 2/13/04." (*Id.*).

Also on February 12, 2004, Coley filed a second Inmate Grievance Form with the BSO, stating, "I was arrested on the 8 of Jan, 04.  Since the 11 of Jan, 04, I have been in constant pain due

to the [illegible] of the problem with my right eye.  I am now out of the drops for my eye which keep the pressure down and my pain is beginning to intensify.  I don't know how much longer that I am expected to deal with this cruel and unusual punishment.  On 2/10/04 I received a judge's order to be seen by an opthomologist [sic].  I have no vision in my right eye because of this.  I feel that this [illegible] will cause me to be permanently blind." (*Coley Med. Rec. 2* at 11).

On February 13, 2004, it appears that Coley was issued a number of prescriptions by a Mirna Waldele, PA-C.  (*See Wex. Med. Rec.* at WEX 0049-0050).  The next day, February 14, 2004, Coley initiated an Inmate Health Service Request, stating, "On Thursday I was told by you that I will have my drops (I only have two (2) drops) that I would have my blood pressure checked twice a day and that I would have a different kind of pain pill." (*Coley Med. Rec. 2* at 14).  The bottom of the form is not filled out.  (*See id.*).

On February 15, 2004, Coley initiated an Inmate Health Service Request, stating, "I was not able to get my medication for pain this morning.  Initially I was taking five different drops for my eye.  Now I am only taking two (2).  You are not an opthomologist [sic] and I am having serious problem [sic] with my eye." (*Wex. Med. Rec.* at WEX 0013).  On February 22, 2004, the bottom of the form was filled out by a Sharon Chicoski, RN, who indicated, "Referral sent for optalmology [sic] consult 2/13/04.  Due to security issue, we cannot inform you of when you will be going." (*Id.*).

On February 20, 2004, Coley was seen by a Dr. Mark, who confirmed that Coley needed to be seen by an ophthalmologist.  (*See Compl.* at ¶ 30).[8]  Six days later, on February 26, 2004, Coley

---

[8] Coley now disputes that this examination took place, (s*ee Opp. to Wex. Mot.* [D.E. 52] at 8), but the resolution of this issue is irrelevant to the disposition of the instant motions.

was seen by a Dr. Kornhaber, who indicated in his records, "Pt. demands ophthalmologist! . . . Blind R eye + large cataract R eye ?? glaucoma." (*Wex. Med. Rec.* at WEX 0083).

On March 1, 2004, Coley was examined by an (unidentified) outside ophthalmologist at Visual Health. (*See id.* at WEX 0037). Coley was diagnosed with a corneal ulcer and was prescribed three types of eye drops. (*See id.* at WEX 0037, WEX 0042-0043, WEX 0046).

On March 3, 2004, Coley was seen by a Dr. Cornell at Visual Health. (*See id.* at WEX 0035). Dr. Cornell diagnosed Coley with a corneal ulcer of the right eye. (*See id.*). After the visit, Dr. Cornell prescribed Coley eye drops and Tylenol #3, (*see id.* at WEX 0029), and noted on a prescription pad, "Pt needs eye drops <u>every</u> hour around the clock[,]" (*id.* at WEX 0044) (emphasis in original).

On March 8, 2004, Coley initiated a new Inmate Health Service Request, stating, "I can no longer deal with the pain in my eye. The pain medication that I am receiving has had no effect, I can't sleep and I'm getting severe headaches." (*Wex. Med. Rec.* at WEX 0012). The bottom of the form was not filled out. (*See id.*). That same day, a Valerie Mindle, RN, completed a Wexford Referral Request form, indicating that Coley was to be seen by ophthalmologist Dr. Cornell. (*See id.* at WEX 0031). The request was marked "urgent" and is marked as having been faxed on March 8, 2004. (*See id.*).

On March 10, 2004, Coley was returned to Visual Health and seen by Dr. Cornell, who indicated on Coley's records, "Corneal ulcer O.D.[9] . . . rec. refer to Bascom Palmer." (*Id.* at WEX 0024). Dr. Cornell marked his recommended referral "Emerg." (*Id.*). Dr. Cornell issued Coley a

---

[9] "O.D. means "right eye" in medical jargon. *See* RANDOM HOUSE UNABRIDGED DICTIONARY (2d ed. 2006).

prescription for eye drops.  (*See id.* at WEX 0025).

A Wexford Referral Request contained in the record indicates that, on or about March 15, 2004, Coley was referred to a corneal specialist at Bascom Palmer Eye Institute in Miami.  (*See id.* at WEX 0022).  Although the Request was marked "Urgent," it appears to have been faxed on March 17, 2004.  (*See id.*).  The Request is signed by what appears to be an "S. Frankowitz, D.O." and contains the notation "Has been seen several time [sic] by [illegible] opthalmologist Dr. Cornell [illegible].  Dr. Cornell requests urgent opth. consult [illegible] pt. is [illegible] Blind O.D. since 1/8/04."  (*Id.*).

Coley was released from BSO custody on March 19, 2004 with a supply of two different medications.  (*See id.* at WEX 0020).  At discharge, his diagnosis was "Total ulceration L eye Acute Glaucoma."[10]  (*Id.*).

On March 24, 2004, Coley was seen at the Broward General Medical Center's Outpatient Clinic, reporting that he was suffering from a "10" on the pain scale.  (*See Broward Outpatient Medical Records ("Broward Out. Med. Rec.")* [D.E. 53-6] at 12-14).  He was seen again on March 31, reporting an "8" on the pain scale.  (*See id.* at 14).  He was seen again on April 28, 2004, reporting a "0" on the pain scale.  (*See id.*).  No further appointments appear in the records.

Coley contends that as a result of the deficient medical care he received from Wexford and the BSO, he suffered needless pain and is now blind in his right eye.

## II.  <u>LEGAL STANDARD</u>

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories,

---

[10] The "L" notation is apparently a mistake.

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ.

P. 56(c). In making this assessment, the Court "must view all the evidence and all factual inferences

reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v.*

*Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve

all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v.*

*Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). "As to materiality, the substantive

law will identify which facts are material. Only disputes over facts that might affect the outcome of

the suit under the governing law will properly preclude the entry of summary judgment. Factual

disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Likewise, a dispute

about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). Summary judgment is proper "against a party who fails to make a showing sufficient to

Case No. 06-61239-CIV-ALTONAGA/Turnoff

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In those cases, there is no genuine issue of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## III.  ANALYSIS

### A.    Coley's Negligence Claims (Counts I and III of the Complaint)

#### 1.    Wexford's Motion (Count I of Complaint)

Wexford contends that summary judgment should be entered in its favor on Count I of Coley's Complaint because Coley has failed to establish a *prima facie* case of medical negligence. In support of this contention, Wexford asserts that Coley has failed to demonstrate a genuine issue of material fact regarding: (1) whether the treatment provided by Wexford violated the prevailing standard of care; and (2) whether Wexford's conduct was a substantial factor in causing Coley's right eye blindness.

#### a.    *Standard of Care*

In order to establish that Wexford violated the prevailing standard of care, Coley must demonstrate that Wexford failed to provide the "level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers." *Auster v. Gertrude & Philip Strax Breast Cancer Detection Inst.*, 649 So. 2d 883, 886 (Fla. 4th DCA 1995) (quoting Fla. Stat. § 766.102(1)). Wexford asserts it is entitled to summary judgment on this issue because its expert witness, Dr. Emanuel Newmark, contends that "[t]he health care rendered by Wexford from the time of Mr. Coley's incarceration on

11

January 8, 2004 until he was evaluated by the doctors of Visual Health on January 15, 2004 was reasonable and acceptable," and "Wexford . . . acted within the standard of care in the community and provided the necessary, reasonable and appropriate medical care and treatment for Orion Coley while he was in the Broward County Jail." (*Affidavit of Emanuel Newmark, M.D. ("Newmark Aff.")* [D.E. 47-14] at ¶ 18).

In his Opposition, Coley points out that his experts' affidavits contradict Dr. Newmark's affidavit. In particular, Coley points to an affidavit from Dr. Martin Schulman, who avers:

> The deviations from the standard of medical care of Wexford . . . include timely access to medical care, referral to consultative services, adequacy of administration of medications, poor follow up to the efficacy of treatment, patient discharge provided with a short time supply of prescribed medications, and delayed request for an emergency consultation at the Bascolm [sic] Palmer Eye Institute.

(*First Affidavit of Martin Schulman, PhD., M.D. ("Schulman Aff. 1")* [D.E. 53-9] at ¶ 14). Both of the parties' experts premise their opinions on a review of Coley's medical records. This conflict creates a genuine issue of material fact for the jury and summary judgment is clearly not appropriate.[11]

### b.    *Causation*

In order to prevail on his negligence claim, Coley must also demonstrate causation, that is, that "what was done or failed to be done probably would have affected the outcome" of his condition. *Gooding v. Univ. Hosp. Building, Inc.*, 445 So. 2d 1015, 1020 (Fla. 1984). Wexford argues that

---

[11] In its Reply brief, Wexford asserts that Dr. Schulman's affidavit conflicts with his deposition testimony such that it may not be relied upon to defeat summary judgment. The undersigned has reviewed Dr. Schulman's deposition testimony and finds it does not conflict with his affidavit with respect to the standard of care.

In addition, Dr. Newmark himself testified that, "the follow-up with Visual Health should have been earlier. I don't know why [Coley] was not returned there. . . . But I do think that appropriate treatment would have been that he get a more close follow-up than over a month." (*Deposition of Emanuel Newmark, M.D.* [D.E. 53-18] at 2).

summary judgment is appropriate on this issue because the undisputed facts demonstrate that Coley's eye condition pre-dated his incarceration and was not exacerbated by Wexford's treatment (or lack of treatment) of the condition.  In support of its argument, Wexford relies solely on the affidavit of Dr. Newmark, who opines that: (1) on December 26, 2003, prior to his incarceration, Coley received treatment for his eye condition and the vision in his right eye was recorded as 20/200, or legally blind; (2) on January 12, 2004, toward the beginning of his incarceration, Coley was recorded as having no vision in his right eye; (3) "Mr. Coley suffered from a pre-existing, serious, sight-diminishing condition, . . . prior to his incarceration on January 8, 2004[;]" and (4) "the care and treatment given to Orion Coley did not proximately cause or substantially contribute to any permanent damage or loss of vision in his right eye."  (*Newmark Aff.* at ¶¶ 4, 7, 17-18).

In his Opposition, Coley asserts that a genuine issue of material fact exists, as evidenced by the affidavits of Dr. Schulman, Dr. Lawrence Mendel, and nurse Lisa Burton.  Dr. Schulman opines that " within a reasonable degree of medical probability . . . the breach of the prevailing standards of care by Wexford . . . proximately caused, or substantially contributed to the permanent damage and loss of vision in ORION COLEY'S right eye."  (*Schulman Aff. 1* at ¶ 15).  Dr. Schulman also avers that the fact that Coley had 20/200 vision and was "legally blind" before his incarceration does not mean that his condition did not deteriorate while he was incarcerated: "20/200 vision while impaired is significantly better than no vision or light perception vision . . . . 'Legally blind' is a functional term and in no way refers to a complete lack of vision and cannot be defined as a complete lack of vision." (*Second Affidavit of Martin Schulman, PhD., M.D.* [D.E. 53-10] at ¶¶ 4-5).  Dr. Mendel opines that "[Coley's] lack of access to appropriate followup [sic] care deprived him of a chance to maintain his

13

visual function and subjected him to needless pain and suffering." (*See Affidavit of Lawrence H. Mendel, D.O.* [D.E. 53-8] at 6).   Nurse Burton does not explicitly opine about causation.   (*See Affidavit of Lisa Burton, RN* [D.E. 53-2]).

Wexford challenges Dr. Schulman's affidavit, contending it should be ignored because it contradicts Dr. Schulman's deposition testimony.   In his deposition, Dr. Schulman testified as follows:

> Q:   Can you [say] within a reasonable degree of medical certainty that had Mr. Coley   received different treatment from the time of his incarceration January 9, 2004 through January 15th, 2004 whether it would have changed the outcome of the condition he has with regard to his eye today?
>        . . .
> A:   I cannot answer that because I don't know, again, I don't know what his medical problem was.

(*Deposition of Martin Schulman, PhD., M.D.* [D.E. 60-3, Exh. B] at 41:12-23).   Dr. Schulman also testified, however, as follows:

> Q:   Is it your opinion that had Mr. Coley received care within or above the standard of care while incarcerated during the time that you have indicated, that his condition would not have resulted in blindness?
>        . . .
> A:   I can say with medical certainty that if he had been treated adequately, perhaps the damage would not have been as extensive.

(*Id.* at 50:23-51:7).

These inconsistencies may be properly explored through the course of cross-examination at trial, not through exclusion of Dr. Schulman's affidavit.   Wexford also argues that Dr. Mendel's and Lisa Burton's affidavits should be excluded because neither of the affiants is an ophthalmologist. Wexford's objection, which is unsupported by any legal authority, cannot properly be raised in a reply brief in support of a motion for summary judgment.   Wexford is free to challenge the qualifications

of Coley's proffered experts, either in an attempt to have the experts excluded, or in an attempt to impeach the experts' credibility, during trial. On this record, the undersigned cannot say that no genuine issue of material fact exists regarding whether Wexford's treatment caused or substantially contributed to Coley's right eye condition. This issue, too, is one properly suited to jury determination. Accordingly, entry of summary judgment in Wexford's favor is not appropriate.

### 2.    BSO's Motion (Count III of Complaint)

The BSO argues that it is entitled to summary judgment on Coley's common law negligence claim against it because: (1) the state has not waived its sovereign immunity with respect to suits premised upon acts by independent contractors; and (2) there is no record evidence of negligence by BSO employees (as distinguished from Wexford personnel). In his Opposition, Coley does not challenge the BSO's assertion that it may not be held liable for the actions of Wexford personnel. Instead, Coley asserts that the evidence demonstrates the BSO itself was negligent in that its employees did not ensure that Coley had access to adequate medical care, breaching the BSO's independent duty to Coley. (*See Opp. to BSO Mot.* [D.E. 51] at 24). Coley therefore contends that there is a genuine issue of material fact regarding "whether BSO failed to act with reasonable care and whether its to act failure [sic] was the proximate cause of damage to Coley." (*Id.*). In its Reply, the BSO contends that every time Coley complained to BSO employees (via Inmate Grievance Forms), as opposed to Wexford employees, he received prompt medical care. The evidence does not support the BSO's contention.

Coley filled out his first Inmate Grievance Form on January 29, 2004. (*See Coley Med. Rec.* at 41). The record reflects that Coley was not examined by a physician for weeks after filing his

grievance and that he filed numerous Inmate Health Service Requests, and obtained a court order requiring that he be seen by a physician, before he obtained that examination.  Coley filled out his second Grievance Form on February 12, 2004, in which he stated, among other things, "On 2/10/04 I received a judge's order to be seen by an opthomologist [sic].  I have no vision in my right eye because of this.  I feel that this [illegible] will cause me to be permanently blind."  (*Coley Med. Rec. 2* at 11).  The record reflects that Coley was not seen by a physician until February 20 or 26.

There exists a genuine issue of material fact regarding whether Coley was provided "prompt medical care" after filing his Inmate Grievance Forms and whether the BSO's conduct upon receiving those forms constituted a violation of the applicable standard of care.  Accordingly, entry of summary judgment on Coley's negligence claim against the BSO is unwarranted.

### B.  Coley's Section 1983 Civil Rights Claims (Counts II and IV of the Complaint)

#### 1.  Legal Standard

In his Section 1983 claims, Coley asserts that both the BSO and Wexford deprived him of his constitutional rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to ensure his access to adequate medical care while incarcerated.  (*See Compl.* at ¶¶ 43, 68).  In order to establish his Section 1983 claims, Coley must demonstrate, among other things, that the acts he asserts violated his rights were performed as part of a "custom, policy, or practice" followed by the BSO and/or Wexford.  *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705-06 (11th Cir. 1985) (citing *Berdin v. Duggan*, 701 F.2d 909 (11th Cir. 1983)).  In addition, the parties agree that to succeed on a Section 1983 claim premised upon deficient medical care during incarceration, a plaintiff must establish that the defendant(s) acted with "deliberate indifference to

16

serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

2.    <u>Analysis of Coley's Section 1983 Claims</u>

The BSO initially argues that it is entitled to summary judgment on any claim premised upon violations of Coley's Fifth Amendment rights because the "Fifth Amendment is applicable to the actions of federal, not state government." *Johnson v. Cannon*, 947 F. Supp. 1567, 1572 (M.D. Fla. 1996) (citing *Barron v. Mayor & City Council*, 32 U.S. 243 (1883)). The BSO is correct; Coley may not pursue a Section 1983 claim based upon any alleged violation of his Fifth Amendment rights.

With respect to Coley's Eighth Amendment claim, the BSO asserts it is entitled to summary judgment because the Eighth Amendment is inapplicable to a pretrial detainee, which Coley was at the time of the events at issue in this case. In support of its contention, the BSO cites *Lancaster v. Monroe County, Ala.*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997), in which the Eleventh Circuit noted that "treatment of a pre-trial detainee is governed by the Due Process Clause of the Fourteenth Amendment, . . . while the Cruel and Unusual Punishment Clause of the Eighth Amendment governs an official's treatment of a convicted prisoner." The BSO is correct,[12] and Coley may not pursue his Section 1983 claim based upon any alleged violation of his rights under the Eighth Amendment. [13]

With respect to Coley's Fourteenth Amendment claim, Defendants assert that Coley has failed to establish any evidence of: (1) Defendants' "deliberate indifference" to Coley's serious medical

---

[12] The Eleventh Circuit noted in *Lancaster*, however, that claims premised on the Eighth Amendment and the Fourteenth Amendment are governed by the same "deliberate indifference" standard such that the analyses of the two types of claims are identical. *See* 116 F.3d at 1425 n.6.

[13] Although Wexford did not raise the arguments the BSO raised with respect to Coley's Fifth Amendment and Eighth Amendment claims, because Coley was given an adequate opportunity to respond to those arguments in his response to the BSO's Motion, the undersigned finds that the conclusions reached here with respect to Coley's Fifth and Eighth Amendment claims apply equally to his claims against Wexford.

needs; and (2) an official custom or policy adopted by Defendants that caused Coley's alleged deprivation of rights.  In addition, the BSO asserts that Coley has failed to establish any evidence of a causal connection between any misconduct on the part of the BSO and the injuries Coley allegedly sustained.  The undersigned addresses these issues in turn, distinguishing between the two Defendants as necessary.

a.      *"Deliberate Indifference"*

In order to establish "deliberate indifference," Coley must demonstrate that each of the Defendants had knowledge of his need for medical care and intentionally refused to provide that care. *See Ancata*, 769 F.2d at 704.  Under the "deliberate indifference" standard, "an inadvertent failure to provide adequate medical care" does not properly state a claim under Section 1983.  *Estelle*, 429 U.S. at 105.  Instead, Coley must show that the Defendants "actually knew of 'an excessive risk to inmate health or safety' and disregarded that risk." *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).  A genuine issue of material fact exists as to this issue only if Coley can demonstrate some evidence (which may be circumstantial) that Defendants were subjectively aware of the risk to his health.  *See id.*

Defendants contend there is no evidence of deliberate indifference because Coley was, in fact, treated by Wexford personnel when he requested treatment and that treatment comported with the applicable standard of care.  That issue is, of course, disputed.  The record demonstrates that many of Coley's requests for medical assistance, including his Inmate Grievance Forms filed with the BSO, went unanswered and, at times, Coley had to wait several days or more to receive treatment.  In addition, after his initial visit to Visual Health on January 15, 2004 (which Wexford scheduled only

after receiving a court order to do so), Coley was not returned to Visual Health for a follow-up examination until March 1, 2004, over two weeks after the issuance of the second court order requiring that Coley be seen by a specialist in treatment of the eye. These facts, and in particular the statements contained in the various communications, demonstrate at least some evidence of awareness of the risk to inmate health and deliberate indifference by Defendants. Therefore, entry of summary judgment for Defendants is not appropriate on this basis.

> b.   *Custom or Policy*

As stated, in order to establish a Section 1983 claim, Coley must also demonstrate that Defendants committed their acts or omissions as part of a "custom, policy, or practice." *Ancata*, 769 F.2d at 705-06. In *Ancata*, the Eleventh Circuit listed some types of policies or customs that could be found to satisfy this element, including requiring inmates to obtain court orders before receiving treatment to which they are entitled or failing to provide access to specialists where those specialists would be too expensive. *See id.* at 706.

In his Opposition, Coley sets forth the following Wexford/BSO policies or customs that he asserts caused his injuries:

> (1)   The Contract [between the BSO and Wexford] permits an LPN to be used beyond her capacities by allowing her to perform inmate intake screening . . . .
>
> (2)   The Contract permits an LPN to be used beyond her capacities by allowing her to triage sick call (inmate's health services requests) . . . .
>
> (3)   [Defendants'] Custom of allowing forty-eight (48) hours to triage and refer Inmate sick calls, violated their own policy of providing inmates medical care on the same [sic] as the request was made . . . .
>
> (4)   Defendant Wexford's policy of only writing prescriptions week [sic] at a time

and continued failure to promptly submit orders to the pharmacy created interruptions in the delivery of medication to Coley . . . .

(5)     Defendant Wexford did not have adequate procedures in place to accommodate an inmate that [sic] was prescribed medication with complex dosing regimes . . . .

(6)     Defendant Wexford did not have adequate procedures or policies in place to ensure that Wexford's medical records followed him when he was transferred from one BSO facility to the other . . . .

(7)     Defendant BSO did not have adequate policies or procedures in place to address inmate grievances regarding the medical care provided by Wexford . . . .

(8)     Defendants did not have adequate policies or procedures in place to ensure the court orders regarding prisoner health care were followed in a timely manner . . . .

(9)     The Contract provides that Wexford remain financially responsible for all outside specialty referrals.  This provision provides a financial incentive which actively discourages Wexford from making such referrals.

(*Opp. to Wexford Mot.* [D.E. 51] at 22-23).

        With respect to items (3) through (8), the undersigned finds without further analysis that Coley has failed to meet his burden of showing a genuine issue of material fact.  Coley provides no evidence whatsoever that these practices, which apparently affected him, were actually customs or policies adopted by the BSO and/or Wexford.  In fact, from the record before the Court, it is impossible to say whether Coley's treatment resulted from any policy or custom at all.  In order to defeat summary judgment, Coley must do something more than simply allege that, because he was treated in a certain way, the BSO and/or Wexford must have adopted a policy or custom to treat prisoners in that way.  This is not enough to defeat summary judgment.

        Items (1), (2), and (9) set forth items explicitly mentioned in the contract between the BSO

Case No. 06-61239-CIV-ALTONAGA/Turnoff

and Wexford.  (*See Agreement By and Between The Broward Sheriff's Office and Wexford Health Sources, Inc.* [D.E. 46-5]).  Items (1) and (2) appear to relate to Coley's contention, throughout this case, that Wexford (and, through Wexford, the BSO) hired and utilized medical personnel with insufficient training to adequately evaluate and treat inmates' medical conditions.  Item (9) relates to Coley's contention that he was not given access to specialized medical care in a timely manner.

As such, items (1), (2), and (9) may (or may not) be found to be policies or customs sufficient to support a civil rights claim against the BSO and/or Wexford.  The undersigned cannot say, as a matter of undisputed fact, or as a matter of law, that inclusion of those items in Defendants' contract, is or is not evidence of a policy or custom.  Accordingly, Coley has met his burden of demonstrating a genuine issue of material fact as to the existence of a policy or custom, and summary judgment is inappropriate.

c.    *BSO's Causation Argument*

The BSO further argues it is entitled to summary judgment because Coley cannot demonstrate a causal connection between the policies he focuses on and his alleged injuries.  Coley has focused his civil rights claims on what he alleges constituted the utilization of insufficiently trained medical staff and a policy of denying inmates access to outside specialists.  Coley's theory is that each of these policies is contained within the BSO contract with Wexford.  There exists a genuine issue of material fact regarding whether, if these are found to constitute policies or customs, they contributed to or caused Coley's alleged injuries.  Accordingly, summary judgment is not appropriate.

Case No. 06-61239-CIV-ALTONAGA/Turnoff

## IV.  CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** as follows:

(1)     The BSO's Motion for Summary Judgment **[D.E. 46]** is **DENIED**.

(2)     Wexford's Motion for Summary Judgment **[D.E. 47]** is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 13th day of December, 2007.


*Cecilia M. Altonaga*

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**


Copies provided to:
(1)  Magistrate Judge William C. Turnoff
(2)  All counsel of record

22